Good morning, your honors. Thank you, and may it please the court. My name is John Smeltzer for the EPA, and I'll be sharing four minutes of my time with Kurt Moser for the Montana DEQ, and would like to reserve four minutes for rebuttal. I'd like to start with this court's questions on mootness and finality. With respect to mootness, the parties agree that the cases are not moot for reasons set out in the letters that we sent to the court, so we'll defer to those letters. As to finality, Waterkeeper has filed a separate suit challenging EPA's February 2020 decision to approve a related but different part of Montana's water quality standards. The variances here do not depend on that related provision, and those ongoing proceedings do not threaten the validity of the variances in this case, so they don't impact the finality of this court's judgment. Turning to the merits, there are two sets of issues in this appeal. First, there are issues of Clean Water Act statutory interpretation. Waterkeeper argues that the Clean Water Act, as a matter of law, prohibited states from looking to economic attainability in setting water quality standard variances. We submit that the district court correctly rejected this argument. Second, there are issues of regulatory interpretation. While affirming EPA's authority to approve water quality standard variances based on economic attainability, the district court held that Montana's 2017 variances are flawed because they do not require the dischargers to comply with the interim requirements representing the highest attainable condition from the beginning of the variance period and are not designed to achieve the base water quality standards at the end of the variance period. On this point, the district court simply misconstrued the plain language of the regulation, and its judgment should be reversed. I'd like to begin with the statutory issues in Waterkeeper's appeal because they're foundational to the whole case. Your Honors, Waterkeeper argues that EPA acted contrary to the Clean Water Act in approving Montana's 2017 variances based on economic considerations. That is simply wrong for three reasons. First, EPA approved the variances under its 2015 variance regulation that expressly allows states to consider economic attainability, and Waterkeeper does not challenge that regulation. Your Honors, the 2015 variance regulation specifically states that states may adopt variances if the pollution controls required to achieve the base water quality standards would lead to substantial and widespread economic and social impact. EPA found, based on the evidence held to meet the base water quality standards, that this substantial and widespread economic and social impact would occur. Waterkeeper never challenges that regulatory finding. Waterkeeper doesn't challenge the regulation as interpreted or as applied, and Waterkeeper also never specifically challenges the regulation itself. As we noted in our briefs, in Waterkeeper's second brief and its final reply brief, Waterkeeper never even acknowledges the relevant regulatory provisions, and Waterkeeper below said they weren't challenging the regulation on its face. This Court could construe Waterkeeper's challenge as a facial challenge to the 2015 regulation, but we submit if Waterkeeper is going to challenge a duly promulgated and presumptively valid regulation, Waterkeeper should be required to acknowledge the particular regulation. Second point, Your Honors, by disregarding the regulations, Waterkeeper has failed to meet the requirements within the regulatory scheme. What Waterkeeper does is conflate a variance or the variance requirements with water quality criteria. Water quality standards have two parts, uses and criteria. Under EPA's regulations, the criteria must protect uses based on a sound scientific rationale, and states aren't to look to cost in setting criteria, but a different rule applies to designating uses. Designating uses is a function that's akin to land use planning. Under longstanding EPA regulations, states may consider economic impacts when setting uses. Waterkeeper here simply assumes that the variances are relaxed water quality criteria. Because they don't protect the uses and because they were based on economic considerations, Waterkeeper says, therefore, they violate the statute. But under the regulations, variances are defined as a time-limited use and criteria. They're not simply a replacement water quality criteria. They replace the whole standard. They apply to both the use and the criteria side. But isn't, let me, can I jump in on that point? For a discharger-specific variance, isn't what you just described not necessarily true? What the regulations say, Your Honor, is that in that context, the state does not have to specifically designate an interim use because the base criteria remain for other purposes under the statute and the base criteria remain for other discharges. So it wouldn't make a lot of sense within the regulatory scheme to have a separate designated use for the particular water body. But the theory of the water quality variance is it stands as an interim use for the particular stream. So the same statutory foundation that applies to the water quality standard and the use designation applies to doing something narrower. Water quality variance is a narrower form of downgrading the use for the overall stream. The regulations specifically explain that and they describe that you don't have to specifically designate a use, but that the variance stands in as a surrogate for both the use and the term of the variance. Of course, the variance is available only if the state makes the showing on attainability. So that gets me to the third point with respect to the statutory argument is that Waterkeeper misconstrues the relevant statutory mandate. There are two parts to the statute, right? There's section 1313C2A, which governs water quality standards, and then there's section 1251A, which sets out the particular purposes of the act. If you look specifically at section 1313C2A, in relevant part, it says that states are to consider different uses and that water quality standards are then to serve the purposes of the act. But within the language of section 1313C2A itself, there is no mandate, right? There's no regulatory mandate that states set aquatic life and recreational uses for all waterways. You have to combine section 1313C2A with section 1251A2, the goals of the act, to get that mandate. And when you look at section 1251A2, when it sets out that mandate, it says we're attainable. And that has been a longstanding... Sorry, what do you say in response to the argument that that language by July 1st, 1983 sort of renders the A2 provision irrelevant? I mean, that's just part of the goal, right? The goal was we're attainable to do that by 1983. But the statute, if the 1983 was an end date to the goal, then the mandate doesn't exist either, right? And the statute is reasonably construed as we missed that date goal. But the overall goal of achieving this water quality, I mean, it wouldn't make sense to say that the overall goal goes away. And EPA has consistently interpreted that way well past, right, when that statutory deadline was not met. And so ultimately, what WaterKeeper wants to do in this case is retain the mandate when you marry these two provisions together with the attainability provision, but get rid of the modifier attainability, right? They want to say, yeah, Montana has to set these uses and has to have criteria that meet these uses. But they say it comes from the plain language of 1313C2A by itself. And if you look at that provision by itself, the language just isn't in there. You need section 1251 and attainability to get there. Let me quickly turn to the EPA's appeal in the time I have. And I want to start again with a little bit of context for that. In addition to showing that the base criteria are not attainable, in order to adopt a variance, a state must also show that the interim requirements are the highest attainable condition. That is the best that the dischargers can achieve in this circumstance. And then they also have to show that the time to get there is no longer than necessary to get to that point. Here, WaterKeeper doesn't challenge the findings that Montana and EPA made on the record. And the district court did not disturb those findings. The district court simply held that the, or reinterpreted the regulation to say, well, the variance has to start with the highest attainable condition. And it has to be designed to achieve the base water quality standard. And we submit that's just simply contrary to the plain language of the regulation. The key provision in the regulation is 40 CFR section 131.14B14. And that's where it specifically states that the term of a variance is to be no longer than necessary to achieve the highest attainable condition. And then that section refers you to section 131.14B22, which talks about the documentation that a state must submit when they apply for a variance. And that says the state must justify the length of the variance by, quote, describing the pollutant control activities to achieve the highest attainable condition, including those activities identified through a pollutant minimization plan, which serve as milestones for the water quality variance. Your Honor, this language could not be clearer. The purpose of a variance is to provide progress toward the base water quality standard by setting milestones toward an attainable standard where the base water quality standard is not attainable. And the regulation language clearly states that the time period for the variance is the time needed to achieve those interim highest attainable condition requirements. For example, to get to the highest attainable condition, the state has adopted or proposed a certain control technology. The time period would be based on time needed to design and install that particular equipment. There is no textual support for the district court's interpretation. The only aspect of the regulations the district pointed to was the definition of a variance, which says that a variance is a time-limited designated use and criterion that, quote, must reflect the highest attainable condition during the term of the water quality standard variance. That simply means that the variance requirements, right, that apply in lieu of the base water quality standards apply for the full variance term. And then that also reflects the rule that the variance requirement must be kept current. But nothing in that particular provision states anything about discharges having to meet the highest attainable condition from the start. And the district court's interpretation of the Montana established the steps that are needed to take to get to the highest attainable condition in the time to get there. I've hit the mark. I was trying to understand how the district court reached that interpretation. What led the district court to arrive at that conclusion, that the discharge had to meet the attainability standard, the lower attainability standard, start? Is that what waterkeepers argued? The waterkeeper did not make this argument, Your Honor. It was something the court came to sua sponte based on a view of what waterkeeper was arguing. It's hard for me to get inside the head of the district court. The district court did have some idea. There's a lot here, and I didn't have a chance to really look at the district court filings, but I was just curious if there was something in the court filings. I think ultimately the district court had the view that if the variance doesn't lead you to the base water quality standard, then you'd have a perpetual variance, and you'd never get to the water quality standard. But the regulations specifically say that the variance is term-limited, and they specifically say if you want a new variance, you have to show a new higher highest attainable condition, a new interim goal to meet. And so the district court's analysis doesn't, the district court did not grapple with the regulatory language just as waterkeeper didn't grapple with that language. Okay. Thank you, Your Honor. I'll turn it over. You're sharing some of your time with. Yeah, I'd like to save the rest of my time for rebuttal. Okay. Let's see. Next. Mr. Moser. Yes, Mr. Moser. Yes, good morning, and may it please the court. My name is Kurt Moser, and I represent the State of Montana Department of Environmental Quality. Montana found that the application of its base numeric nutrient standards would cause substantial and widespread economic and social impacts, and therefore develop a general nutrient standards variance. The economic findings supporting the variance were provided to EPA and were used to support EPA's decision to approve Montana's general variance for 36 municipal facilities. Upper Missouri Waterkeeper did not challenge the finding that the application of the base numeric nutrient standards would cause substantial and or the rationale behind the temporary variance standard that was developed that is contained within the general variance. Waterkeeper only challenged the principle that water quality standards can be based on economic feasibility. EPA's regulations have long allowed designated uses to be removed or downgraded for economic reasons, and from the beginning of the variance development, Montana understood that the use of variances could forestall the need to permanent downgrade uses. Montana recognized that the proposed numeric nutrient standards were so stringent that a variance would be needed at the time of adoption or an immediate downgrade process would have to begin. District Court erred when it found fault with the construct of the variances term, and when it concluded variances must identify a date certain by which Montana's underlying base numeric nutrient standards must be met. Montana cannot identify such a date, and that's why a variance approach was necessary. The court seems to confuse variances here with compliance schedules. If it were possible to establish a date certain, a variance would not be appropriate and a compliance schedule would be the proper tool. By requiring a variance term that ends with the base numeric nutrient standards, the District Court contradicts its own decision. Montana cannot develop a variance term that ends with attainment of the base standards because doing so would cause substantial and widespread economic impacts to its communities. The District Court also overlooked the ongoing progress that is made under Montana's general variance, and it also erred when finding the variance had no practical backstop. Montana's general variance requires the state to periodically consider if the justification for the variance remains valid. The variance is clearly time limited both under state law and through EPA's review and approval process. The periodic review and other requirements ensure the variance is not an open-ended off-ramp for meeting the base standards. Progress must be achieved, must be maintained, and additional activities to improve processes and pollutant controls are required under the variance. The use of the variance is also evaluated through a discharge permitting process which begins every five years for permittees. If the variance has new requirements or is no longer applicable, the permit must then incorporate those changes. Montana worked for many years to develop its base numeric nutrient standards and its accompanying general variance. This was a collaborative effort of Montana's nutrient work group that included Montana communities, environmental and industry groups, as well as EPA. By adopting these numeric nutrient criteria on a statewide basis, Montana took a significant step towards improving its waters that very few states have taken. The general variance was always a critical part of Montana's plan and plainly necessary for its communities to avoid substantial and widespread economic. Thank you. Let's let's hear from Waterkeeper. Thank you, your honor. May it please the court. My name is Jeanette Brimmer and I represent Upper Missouri River Waterkeeper in this case. Really, this case is about whether fundamental Clean Water Act requirements for protective water quality standards are the two primary ways that the Clean Water Act functions. Before you jump too deep into the merits, could you just briefly respond to the mootness inquiry that we sent out? Absolutely, your honor. I was going to turn to that first. As to the mootness question, we would agree with Mr. Smeltzer's representation that the party is no longer think that this is moot because of developments in the later case and that the poison pill is not in effect. As to the finality... And the basis for that determination that the poison pill is not in effect rests on what again? The court determined, the district court in the second case has issued an order saying that because of the way it had structured relief in this case, the poison pill had not yet taken effect. And that was the primary thing that would have mooted this case. So given those rulings, we would agree with Mr. Smeltzer that this case is now not moot. So it hadn't taken effect. There were two orders. There was EPA's rejection that allowed the poison pill to go into effect. So that's not a problem. And the court's order is not a problem. Is that right? Yeah, what occurred, your honor, is when EPA approved, or excuse me, disapproved the replacement 12B variants that the state had developed in response to the court's remedy order in this case. EPA also at that point in time approved the poison pill, which negated the protective water quality standards in 12A. That was the foundation for our initial argument that this case was moot because there was no longer anything to have a variance from. In its ruling last fall, the district court in that second case found that in fact the poison pill had not taken effect because one of the triggering events had not occurred. The court noted that it considered 12B, the original one that is the it hadn't triggered the 12A poison pill at that point in time. Okay, thank you for your clarification. Sure, absolutely, your honor. It is a little twisty. And as to the finality point, we also agree with Mr. Smeltzer that at this point in time, a decision in this case goes only to the original 12B variants that is at issue in this case. There are different issues different issues at play in the second case and so that this case is final and appealed. Okay. In my primary argument today, I would like to address three points. And really, I'm going to start with EPA's appeal because in addressing that part of the appeal, I think that the court doesn't need to get to Waterkeepers Cross-Appeal. I think that that court was correct that the circular 12B variants away from the protective water quality standards did conform to EPA's regulations. And it didn't conform because it failed to require pollutant discharges to at least meet the highest attainable condition for the water throughout the term of the variants. And it failed to require that protective standards ultimately be met at some point in time. My second point is that the district court did not abuse its discretion in crafting a remedy that narrowly and carefully addressed those very issues. And third, on our cross appeal, if in fact this court determines that EPA's interpretation of its regulations as presented by Mr. Smeltzer today are correct, then in fact the district court erred in its legal rule that section 1313 of the Clean Water Act allows this kind of wholesale replacement water quality standard based solely on avoiding the cost to pollution dischargers as opposed to what is necessary to protect Montana's designated uses. So turning first to the point that the district court was correct in finding that the circular 12B variants violate EPA regulations in the Clean Water Act. It made that finding because the variants does not require highest attainable condition throughout the term of the variants. And the variants lacks any kind of plan, timeline, or deadline for meeting the protective standard. And Judge Paez, you asked Mr. Smeltzer, where did the district court find that? Well, the district court's order, and the district court actually has two orders that I would encourage the court to review, both the initial one from March of 2019, but then one at the end of 2019 when it clarified some of these points. The district court made very clear that it was looking at EPA's regulations. In several places, EPA regulations dictate that the highest attainable condition is to be met throughout the term of the variants. In defining a variance, it says during the term of the variants. And the court found that if there was no plan or timeline for reaching the protective water quality standards, then we've got an indefinite period. If I could break in. Absolutely. You said throughout, and then you said, well, it requires during. In your view, are those grammatically synonymous? Yes, Your Honor, they are. Throughout. Synonymous. During. Yes, we would take that position. In the definition of a variance, it uses the word. So that during does not allow what I would call a slope or a progress. That if you're required to meet something throughout a timeframe, okay? You know, I'm supposed to have a refrigerator throughout March. That means I have to have it on March 1st. As opposed to I get a refrigerator during March might allow me to be sometime during. But so you read it as being identical, and you have to have it on day one. Is that correct? Our position is that during and throughout mean that the pollutant dischargers need to get to highest attainable condition as soon as possible. We do recognize, of course, that there has to be a scheduled compliance type timeline, because if it requires technology, that's not going to be built on day one. But it's certainly. That doesn't seem to be the district court's linguistic analysis, does it? The district court seems to say that throughout means right now. That's where it gets the contradiction. I think that the district court was ultimately taking the position that throughout means as soon as possible, which is the position the district court put in its remedies order. It asked the parties to brief how soon can the highest attainable condition be met, given that there may be technology. I think in looking at EPA's argument, what they would have this court say is that the words during and throughout really mean or are synonymous with at the end. And that can't possibly be a reasonable interpretation of EPA's regulations. If they wanted it to say at the end, they could have said at the end. But instead, we have during and throughout. And 20 years from now is when they have to meet the pollutant dischargers have to meet the highest attainable condition. And in fact, when one reads the language in 12B itself, you see that EPA in the state contemplate that maybe it will even be longer than 20 years, that in fact, at the end of that 20 year period, we may see another 20 year variance. And in fact, they contemplate that maybe we'll never get there because we may not want to spend the money necessary to protect designated uses. That's what the parties have clearly said in this record. That cannot be what during and throughout mean. A council you you also just said, because it might be too expensive, and maybe I'm segwaying ahead of your argument. And if I am, just put me off. But the plain language of 1313, which you you emphasize in your briefs, the language does say such standards shall be such as to protect the public health or welfare. Do you agree or disagree that EPA and Montana can consider welfare in setting standards? Your Honor, I think that they are to protect the public health or welfare. But I also and I agree, I agree that that is, in fact, the language of the statute, I do not believe that that means that the rest of the statute can be read to mean that as long as we want to pay for that, that is in search of an ambiguity or an allowance in the statute that is not there, because the statute also plainly provides that the designated uses shall include public health, fishing, swimming, boating, agriculture, industry. I understand that counsel, but it, you know, first you said yes, welfare is there. But it seems as though you're segwaying to say that it really isn't. I don't want to push you to what you're not actually saying. But how can they consider welfare if you agree that they can consider welfare? Tell me in your view, how they can consider welfare. Your Honor, I would disagree with the reading of welfare as allowing the consideration of costs, because I know that's that's fair. That's what I didn't want to push you there. If that wasn't actually your position. So we've got welfare in your brief, for example, the opening brief of page two, you say the Clean Water Act does not allow cost considerations to drive water quality standards directly or indirectly. And I would ask you then simply, that is your position, whether it costs 10 million or 100 million, or 10 trillion. That correct? That is correct, Your Honor, that the language of the statute does not provide for that Congress knows how to provide for that and has done. So we've got many cases where the Supreme Court has said, for example, Congress does not hide elephants and mouse. I just didn't want to, to be sure that if it costs Kalispell $10 trillion, Montana can't consider that. Your Honor, I would argue that they can't consider costs under setting protective water quality standards. What we have is not a quote, I'm sorry, Your Honor. So where do they consider it? Well, Your Honor, for example, Mr. Smeltzer pointed out that there is a schedule of compliance, a recognition that municipalities, for example, have budgeting and technology concerns. There are also provisions that EPA has that said that if it is impossible to meet a water quality standard, in other words, if I'm going to throw out an example I was familiar with when I worked in Minnesota, there was a pond in the cement of the city. And it was never going to be a trout stream, right? It's never, ever going to achieve that level of water quality. In that instance, EPA has a clause, a state entity can apply for a use attainability analysis and say, look, we could spend trillions and trillions and trillions to clean up this cement line pond, but it's never going to get there. So we would prefer to protect it for some lesser designated use. That is there, but it's got a lot of safeguards in it. There are a lot of requirements that a state has to pass because we do not want, and Congress did not want, someone to simply throw up their hands and say, well, it's going to be a little bit hard. So we don't want to protect, for example, the pristine trout streams of the state of Montana. I think the city of Bozeman, I'd like to give the court an example because I think that's a really good example here, as long as we're talking about cities and discharges. The city of Bozeman is one of the fastest growing small cities in the nation. It's an outdoors hub, so it attracts a lot of people there. It's a lovely place to live. And the East Gallatin River goes through that town, and that's where their wastewater treatment discharges to. And the city of Bozeman's wastewater treatment plant currently discharges 20 times higher than the 12-day standard. What's going to be necessary to clean up the East Gallatin River? And that's just one of the pollutant sources to that river. And that river, Montana, Montana has set the designated uses that it wants to protect for that river because it is a trout stream flowing to other trout streams that are world-class as fishable and swimmable. It protects drinking. It protects public health. It protects swimming, boating, fish, aquatic life, and agriculture and industry. Those are the things that Montana says we've got to set water quality standards to protect. And what Congress said in Section 1313, then you set the criteria to protect those. That is the, it is like the National Ambient Air Quality Standards. It is the standard of cleanliness that this nation wants to achieve and needs to achieve for its waters. It is the goalpost against which we measure the cleanliness of the waters. And that is what Section 1313 provides. But again, I think that here, the district court, in interpreting and applying EPA's regulations in a reasonable manner, has struck that balance. It has ensured that we do not have an indefinite off-ramp from meeting the requirements of Section 1313. That we have that goalpost in mind, which again, EPA itself says that's what a variance is for. It's a set of in fact, EPA says, water quality standard. We heard Mr. Smeltzer say that. With just a limited time there. Well, you've got to have that goalpost at the end and you've got to have measured steps to that goalpost. That's why EPA regulations say achieve the highest attainable condition as soon as possible and apply it throughout the term of the variance. So how long under the district court's order does Montana have to reach that limited period of highest attainability during the variance period? Thank you, your honor. That goes to our second point that the district court actually struck a balance and did not abuse its discretion in the remedy. In its remedy order, first the court said, brief how long you think it's going to take parties. How long will it take to get to highest attainable condition and what is a standard? Waterkeeper submitted its brief and we in aid of the court submitted an expert's report. We brought on and paid for an expert so that we could assist the court in knowing what is reasonable. Now based upon all of the submissions of the parties, the court ordered without specific deadlines, but it said, I want you to go back, rewrite the 12B variance so we can still have variance, but I need highest attainable condition to be met as soon as possible so that it applies throughout the term of the variance. And I need a goalpost. I need to know that there's some plan, some timeline for meeting the actual protective standard. And the court said, look to that expert's report for guidance state when you are rewriting this. It did not set specific deadlines itself. It allowed the state and EPA to craft those solutions, but it also put some reasonable sideboards on that. And that's really entirely within the district court's impression in crafting a remedy to address the legal problems that it should have done. Counselor, can I ask you, do you agree with the EPA's assertion that you are not challenging the validity of the variance We did not intend to bring a facial challenge in this case. We did, however, bring a challenge to the way that EPA was interpreting and applying this regulation because what happens with the way they are interpreting it is an open-ended indefinite off-ramp from meeting protective water quality standards, water quality standards designed to protect designated uses. That's what the statute requires and the way EPA is interpreting and applying its regulations here. It just blows the doors wide open on that. There's no protections that we see for the actual uses anytime in the future. Counsel, if what you call the indefinite off-ramp, if I understand EPA's position is at the end of the term, 17 years now, or perhaps earlier because some of the places have been doing better, if they didn't want to go to the base immediately, they would have to go through the same process for any new variance and that could be challenged. That is, if at the end of the 17 years you say, look, you're just bluffing, you can do it tomorrow, then you could that challenge in the administrative process to start with, right? They could not delay further without a new variance procedure, both administratively and then challengeable in court. Is that correct? Your Honor, it is correct that at the end of this variance, if there's going to be another variance, there would have to be a process whereby the state makes that proposal to EPA, has to demonstrate to EPA that it gets that proposal and that EPA approves it. I will note for the court that the record is clear, however, that the state and EPA are already anticipating that. And in fact, the 12B variance itself includes language saying we anticipate there may very well be a new variance. And I would point out that the record is clear that they say there will be a new variance unless there's a lot cheaper technology that comes down the road that the state, in its discretion, decides is cheap enough that we will move forward meeting the actual protective standard. So there is definitely some foreshadowing, Your Honor, that that's where we're headed. There will be a process. I agree we can participate. We just believe that this variance does not meet the standards of the law today. I see that I only have eight seconds left. I won't start a new point. We simply ask that you affirm the district court in its ruling in this case. Thank you. Thank you. I think the EPA has a few minutes for rebuttal. You need to unmute. Sorry, Your Honor. Thank you. Let me just address a few of the points that counsel raised. First, counsel said that the plain language of the regulation, that the terms during and throughout mean that the standard has to be met at the beginning. And that's exactly what the language doesn't say, right? It doesn't say it has to be met at the beginning. It says the requirements apply during this term. That just means they apply instead of the base water quality standards during this period. Counsel also suggested, well, what the district court was saying is that the highest attainable condition should be met as soon as possible. But that's exactly what the plain language that I gave the court means, right? No longer than necessary to achieve the highest attainable condition means as soon as possible, subject only to these attainability concerns. If the highest attainable condition is the best you can do without causing substantial and widespread social and economic impact. So they're going as fast as they can. Waterkeeper never challenged the findings, the specific findings that said those dates and those deadlines were as fast as possible. They came in after the fact, but this expert reported the remedy stage. That is the kind of information that Waterkeeper should have provided to Montana when Montana was reviewing that information. But this is a regulatory determination that was never challenged. So the record is Montana is requiring its dischargers to get to the highest attainable condition as soon as possible. And the counsel is just wrong that it's necessarily 20 years, as we explained in the brief. It varies and it will be determined at the permitting stage for each particular discharge. Counsel's also wrong in saying this has something to do with what Montana wants or what any community wants to spend. It's about meeting the stringent standards for demonstrating attainability. The attainability standard in the variance regulation is modeled after the use attainability analysis that Ms. Brimmer referenced with respect to her example of the pond. And it's not an impossibility standard, it's an attainability standard. And it's essentially the same set of stringent requirements that again were met here and were not challenged. Your Honor, I see my time is essentially up. So I thank the court for its time and we would ask the court to reverse the disreport on those points where the disreport misconstrued the regulation and that's otherwise affirmed. Thank you. Thank you counsel. We appreciate all the arguments this morning. Interesting case and the matter is submitted at this time. Thank you. That ends our session for today. Court for this session now stands adjourned. Thank you. Thank you.
judges: Boggs, Paez, Watford